UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X

VAL SCOTT SHERMAN,

                      Plaintiff,

        -against-

NANCY A. BERRYHILL,[1]
Acting Commissioner of Social Security,

                      Defendant.
-------------------------------------------------------------X

**OPINION AND ORDER**

16 Civ. 9303 (JCM)

       Plaintiff Val Scott Sherman ("Plaintiff") commenced this action pursuant to 42 U.S.C.

§ 405(g), challenging the decision of the Commissioner of Social Security ("the

Commissioner"), which denied Plaintiff's application for disability insurance benefits, finding

him not disabled within the meaning of the Social Security Act. (Docket No. 1). Presently

before this Court are (1) Plaintiff's motion, pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure, for judgment on the pleadings, (Docket No. 20), and (2) the Commissioner's cross-

motion for judgment on the pleadings, (Docket No. 24).[2] For the reasons below, Plaintiff's

motion is granted and the Commissioner's cross-motion is denied. The Court remands the case

to the Commissioner, pursuant to sentence four of 42 U.S.C. § 405(g), for further administrative

proceedings consistent with this decision.

---

[1] Nancy A. Berryhill is now the Acting Commissioner of Social Security and is substituted for former Acting Commissioner Carolyn W. Colvin as the Defendant in this action, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

[2] This action is before me for all purposes on consent of the parties, pursuant to 28 U.S.C. § 636(c). (Docket No. 14).

## I. BACKGROUND

Plaintiff was born in 1962. (R.[3] 109).  He filed an application for disability insurance

benefits on or about August 1, 2013, alleging that he became disabled as of August 15, 2004,

nine years earlier, due to obsessive compulsive disorder ("OCD"), anxiety, depression and

hoarding. (R. 109–10, 119, 174).  His application was denied, and he requested a hearing, which

was held on May 12, 2015. (R. 30–49).  At the hearing, Plaintiff amended the alleged onset date

of his disability to December 31, 2011, the date he was last insured for disability insurance

benefits. (R. 17).  Thus, the period at issue consists of one day, December 31, 2011.

Administrative Law Judge ("ALJ") Gitel Reich issued a decision on May 27, 2015, denying the

claim. (R. 17–24).  Plaintiff requested review by the Appeals Council, which denied the request

on September 29, 2016, (R. 1–6), making the ALJ's decision the final decision of the

Commissioner subject to review.

### A.  Medical Evidence Generated Before December 31, 2011

As summarized below, the administrative record reflects medical treatment Plaintiff

received from multiple sources prior to the expiration of his insured status on December 31,

2011.

### 1.  Stuart Weiss, M.D.

Dr. Stuart Weiss, an internist, saw Plaintiff at least twice prior to December 31, 2011.

(R. 226–27).  On January 15, 2010, Dr. Weiss noted that Plaintiff complained of increased

anxiety and that "rituals" were not helping. (R. 227).  A long list of medications was recorded,

including psychotropic medications Lamictal and Klonopin, along with a notation "(Suzanne

Feinstein) psychotherapy." (*Id.*).  Plaintiff saw Dr. Weiss again one year and four months later,

---

[3] Refers to the certified administrative record of proceedings ("Record") related to Plaintiff's application for social
security benefits, filed in this action on March 30, 2017. (Docket No. 15).

on May 9, 2011, seven months before the alleged onset date. (R. 226). According to Dr. Weiss's treatment notes, Plaintiff reported, among other things, depression, decreased energy levels, sleep problems and OCD. (*Id.*).

## 2. Stephen Dillon, M.D.

Dr. Stephen Dillon, an internist, saw Plaintiff three times in 2010 and once in 2011. (R. 241–51). Plaintiff began treatment with Dr. Dillon on February 16, 2010. (R. 241–43). Dr. Dillon noted that Plaintiff had dealt with OCD "since age 12" and was "in therapy and on medications." (R. 241). Dr. Dillon assessed hypertension, hyperlipidemia, gastroesophageal reflux disease ("GERD"), OCD and sleep apnea. (R. 242). Dr. Dillon continued Plaintiff's prescriptions for Lamictal, Temazepam and Ativan. (R. 243).

Dr. Dillon saw Plaintiff again on April 16, 2010, for follow up. (R. 244–45). Dr. Dillon noted that Plaintiff was also seeing Dr. Daniel Cohen, a psychopharmacologist, who had prescribed Dexedrine. (R. 244). Dr. Dillon assessed OCD, hypertension, hyperlipidemia, GERD and urinary hesitancy. (R. 245). He continued Plaintiff's prescriptions for Lamictal, Temazepam and Ativan, in addition to Dexedrine. (*Id.*).

A note dated May 26, 2010, indicates that Plaintiff saw Dr. Dillon for follow up and medication refills. (R. 246). Dr. Dillon assessed urinary hesitancy, OCD, hyperlipidemia, GERD and sleep apnea, and he continued Plaintiff's OCD medications. (R. 247). Dr. Dillon saw Plaintiff again ten months later, on March 21, 2011, nine months before the alleged onset date. (R. 248–50). Plaintiff was interested in seeing a therapist for his OCD issues. (R. 248). Dr. Dillon assessed hypertension, hyperlipidemia, GERD, OCD and hypothyroidism and continued Plaintiff's psychotropic medication regime. (R. 250).

### 3. Alexis Granite, M.D.

Plaintiff was referred to Dr. Alexis Granite by Dr. Dillon on July 8, 2010, one year and five months before the alleged onset date. (R. 286–87).  The referral was for complaints of hair loss over the preceding two months. (R. 286).  Dr. Granite noted that Plaintiff had received a hair transplant in 2007. (*Id.*).  Dr. Granite noted dry skin on Plaintiff's hands from frequent washing. (*Id.*).  On examination, Plaintiff's mood and affect were noted to be pleasant, and he was oriented in all three spheres. (*Id.*).  The assessment was androgenetic alopecia, mild seborrheic dermatitis, mild xerosis (dry skin) and mild acne. (R. 286–87).  Rogaine was recommended for alopecia. (R. 286).

### B.  Medical Evidence Generated After December 31, 2011

As summarized below, the administrative record also reflects medical treatment Plaintiff received from multiple sources after the expiration of his insured status on December 31, 2011.

### 1. Dr. Weiss

After Plaintiff's insured status expired on December 31, 2011, Dr. Weiss next saw Plaintiff ten months later, on October 24, 2012. (R. 225).  He then saw Plaintiff in November and December 2012, (R. 223–24), four times in 2013, (R. 219–22), and once in 2014, (R. 218).  At the October 2012 appointment, Plaintiff told Dr. Weiss that he had a crisis in January, spending most of his time in bed with "emotional issues." (R. 225).  On November 15, 2012, Plaintiff complained of fatigue, feeling weak and sweating. (R. 224).  Plaintiff also reported OCD focused on sex and Paramount Pictures. (*Id.*).  On September 23, 2013, Plaintiff recounted fatigue, interrupted sleep, and that his depression had not improved. (R. 220).  On December 16, 2013, Plaintiff described increased depression. (R. 219).  On March 31, 2014, Dr. Weiss noted chronic insomnia, chronic depression, OCD and emotional eating. (R. 218).

## 2. Dr. Dillon

On November 29, 2012, eleven months after Plaintiff's insured status expired, Dr. Dillon saw Plaintiff for a physical exam and recorded that Plaintiff was "[d]ealing with marked depression—interviewing at Mt. Sinai to participate in ketamine study." (R. 252). Dr. Dillon also noted that Plaintiff was seeing Dr. Matthew Hopperstad, a psychiatrist. (*Id.*). Dr. Dillon assessed hypertension, hyperlipidemia, GERD, OCD, sleep apnea, non-insulin dependent diabetes mellitus, hypothyroidism and low back pain. (R. 253–54). Dr. Dillon continued to treat Plaintiff in 2013 and 2014. (R. 256–60).

A chart entitled "Review of Systems" recurs frequently in Dr. Dillon's records. Under the heading "Psychology," the chart states, "Depression denies, depressed mood, denies, anhedonia. Mental or physical abuse denies. Memory loss none. Insomnia none. Incoordination none. Numbness none." (R. 242, 249, 253, 257). Identical text—including irregularities and errors in font size, punctuation and spacing—appears in every "Review of Systems" chart included in the medical records from Dr. Dillon. (*Id.*). The text appears despite references to "marked depression" and "sleep apnea" in other portions of the same records. (R. 252–53).

## 3. Matthew Hopperstad, M.D.

Dr. Mathew Hopperstad, a psychiatrist, began treating Plaintiff at Mount Sinai Hospital in November 2012, eleven months after Plaintiff's insured status expired. (R. 207, 290). The administrative record contains Dr. Hopperstad's treatment notes for five examinations between April 2013 and August 2013. (R. 208–14). In an exam on April 16, 2013, Mr. Sherman reported persistent OCD concerns about contamination. (R. 213). On mental status examination, Dr. Hopperstad found that Plaintiff's mood/affect was "anxious, stable generally other than brief periods of apparently overwhelming anxiety associated with fear of contamination." (*Id.*).

Plaintiff's thought content was marked by obsessional concerns about contamination. (*Id.*). Dr. Hopperstad diagnosed OCD, hoarding and major depressive disorder, with a Global Assessment of Functioning ("GAF") score of 55. (*Id.*). Dr. Hopperstad adjusted Plaintiff's medications so that he would be maintained on Luvox, Lamictal, Restoril and Ativan. (*Id.*).

At a follow-up appointment on May 17, 2013, Dr. Hopperstad noted that Plaintiff suffered from ongoing depressive symptoms, OCD symptoms, overwhelming emotions and obsessional concerns about contamination. (R. 212). Dr. Hopperstad's diagnoses were unchanged and he began cross titration from Luvox to Prozac. (*Id.*). On June 11, 2013, Plaintiff reported improved depression, decreased hoarding and the ability to clean some of his apartment. (R. 210). Plaintiff continued to experience ongoing depressive symptoms, and his mental status examination and diagnoses were unchanged from prior visits. (R. 210–11). Dr. Hopperstad increased the dosage of Plaintiff's prescription for Prozac. (R. 211).

On July 10, 2013, Dr. Hopperstad noted worsening OCD symptoms. (R. 209). Dr. Hopperstad's mental status examination and diagnoses were unchanged and he switched Plaintiff from Prozac to Cymbalta due to concerns about side effects. (R. 209–10). On August 6, 2013, Plaintiff described doing better overall with improved mood and function, being interested in pursuing a romantic relationship, and taking Cymbalta without clear side effects. (R. 208). However, he also reported ongoing OCD symptoms related to his own semen and Paramount Pictures. (*Id.*). Dr. Hopperstad's mental status examination and diagnoses were unchanged, and he increased Plaintiff's dosage of Cymbalta. (R. 208–09).

In a letter addressed to Plaintiff's counsel on May 30, 2014,[4] Dr. Hopperstad stated that he had been treating Plaintiff since 2012 and opined as follows:

> [Plaintiff] has significant impairment in function due to severe obsessive compulsive disorder (OCD) and depressive symptoms. His impairment significantly impacts his social and occupational function such that he has been unable to work regularly for the last several years. He has sought and received psychotherapy and regular psychiatric care from several clinicians over the last 25 years, despite this his symptoms have remained refractory and to some degree progressive. Given the course and intractable nature of his illness he is likely to continue to have significant limitations in function.

(R. 289).

Dr. Hopperstad also completed a Mental Impairment Questionnaire dated May 30, 2014, in which he reported treating Plaintiff on an approximately monthly basis over the prior eighteen months. (R. 290–95). Dr. Hopperstad diagnosed OCD, major depressive disorder, diabetes mellitus, hypothyroidism, high cholesterol and a GAF score of 50. (R. 290). He reported clinical findings of marked ongoing limitations secondary to intense obsessional concerns, compulsive behavior and avoidance. (*Id.*). Dr. Hopperstad assessed serious limitations in Plaintiff's ability to maintain regular attendance and be punctual within customary tolerances, complete a normal workday and workweek without interruptions from psychologically based symptoms, or deal with normal work stress. (R. 292). He further opined that the limitations would limit Plaintiff's ability to tolerate workplace stress. (*Id.*). Dr. Hopperstad further found marked difficulties in social functioning and moderate difficulties in maintaining concentration, persistence or pace.

---

[4] The letter is dated May 30, 2013. This appears to be an error, as the body of the letter describes a conversation taking place on May 30, 2014, and the fax confirmation data on the top of the letter indicate it was faxed on June 5, 2014. (R. 289).

(R. 294).  Finally, Dr. Hopperstad indicated that Plaintiff would likely miss more than four days of work monthly due to his impairments. (R. 295).

**4.  Evan Leibu, M.D.**

Dr. Evan Leibu, an instructor in the Department of Psychiatry in the Icahn School of Medicine at Mount Sinai, wrote a letter on May 6, 2015, stating that Plaintiff was assessed on June 11, 2012, six months after the expiration of his insured status, for a research study for the treatment of his OCD with intravenous Ketamine. (R. 384).  Plaintiff was not accepted for the Ketamine study but remained in treatment at Mount Sinai for significant OCD and depressive symptoms. (*Id.*).

Progress notes from Dr. Leibu dated July 8, 2014 indicate that Plaintiff presented with a past psychiatric history of OCD, major depressive disorder, and histrionic and dependent personality traits. (R. 297).  Plaintiff described no change in his symptoms, including thoughts of contamination and hoarding, since his last session. (R. 296).  He also reported persistent fears that, if he improved, he would "eventually have a relapse of his symptoms causing him to have contaminated everything." (*Id.*).  Plaintiff was diagnosed with OCD and maintained on Lamictal, Cymbalta, Restoril and Ativan. (R. 297–98).

Continued treatment notes by Dr. Leibu from August 5, 2014 through March 25, 2015 are similar. (R. 300–83).  Plaintiff continued to report contamination and hoarding behavior and expressed fears that he would have a relapse if he improved. (R. 300).  He reported some improvement in his hoarding in October 2014, but continued to have considerable contamination obsessions and compulsive need to complete rituals. (R. 312).  In November 2014, he reported significant worsening in his contamination symptoms and no progress with hoarding. (R. 322).

## C. Other Pre-Hearing Evidence

In a Function Report dated September 8, 2013, Plaintiff reported that he first exhibited OCD symptoms in 1976, when he was twelve years old, and that he tried to manage and hide his disorder, but in 2004 it became too traumatic and difficult to control. (R. 133). Plaintiff indicated that he lacks focus because his mind is constantly attending to sources of potential contamination, and the impulse to avoid anything his mind perceives as contaminated causes him to race home as quickly as possible to wash. (R. 134). These attacks can last as long as it takes him to reduce the contaminated feelings by washing and showering, a minimum of one to two hours. (R. 132–33).

In a letter dated May 4, 2015, Mimi Borden, Plaintiff's sister, stated that Plaintiff has struggled with OCD for many years, even as a child. (R. 193). Ms. Borden stated that, while her brother "has always been extremely smart, thoughtful and hardworking, his disorder has taken over every aspect of his life, to the point that he's no longer able to function or maintain relationships in any healthy or reliable way." (*Id.*). For example, according to Ms. Borden, people and things are prone to being viewed as "contaminated" by Plaintiff, including anyone who works for or comes into contact with Paramount Pictures or any of their companies. (R. 193–94). He also becomes upset when particular pieces of furniture are moved and must routinely wipe down phones, computers and other things with alcohol. (R. 194). She also described hoarding conditions in his home. (R. 194–95).

In an undated Disability Report, Plaintiff stated that Dr. Daniel Cohen treated his OCD, depression and anxiety from 2007 to April 2011 and that Dr. Suzanne Feinstein treated his OCD, depression, anxiety and hoarding between April 2006 and April 2010. (R. 173–83).

**D. Plaintiff's Testimony**

At the hearing on May 12, 2015, Plaintiff was represented by Jeffrey Senter, an attorney from the Urban Justice Center, the same organization representing Plaintiff in this action. (R. 30).  The hearing lasted a total of only twenty-three minutes. (R. 32, 48).  Plaintiff testified that his only work experience since December 31, 2011 was teaching a four-hour class each of the prior two summers—for a total of eight hours of work. (R. 36–37).  When asked by the ALJ if he would accept offers to teach more than once a year, Plaintiff began to respond "No, I don't believe that I mentally would be able to withstand—" but was interrupted by the ALJ, who stated "Okay. And we'll get . . . into that. Okay." (R. 37).  The ALJ next asked Plaintiff about drug use, and Plaintiff denied abusing drugs or alcohol. (R. 38).

Next, Plaintiff was questioned by his attorney about the daily effects of his condition. (R. 38).  Plaintiff testified to difficulties concentrating and managing in his home due to hoarding conditions, an issue that worsened by mid-2011. (R. 39–40).  He also testified that various people, objects, and locations trigger anxiety and OCD, that he feels as if he were in "a glass tube . . . so totally detached from myself and all that I can think of is how quickly can I get home and perform the rituals that are necessary . . . [so that] I am . . . no longer contaminated. And that generally can take anywhere from two . . . to three hours." (R. 41).  Fear of contamination affected his prior job. (R. 45).  He limits his social interactions due to contamination. (R. 43). The ALJ then asked Plaintiff why he felt he would not be able to perform "a job that was simple, that did not have much interaction with people" where he could "sit at a desk in a small office." (R. 46). Plaintiff replied that he would be unable to focus, his mind would be foggy from his medication, and he repeatedly washes his hands throughout the day which would interfere with

working. (*Id.*).  The ALJ did not hear any testimony from a consultative examiner or vocational expert.

**E.  The ALJ's Decision**

In his decision dated May 27, 2015, (R. 14–24), ALJ Reich applied the five-step procedure established by the Commissioner for evaluating disability claims. *See* 20 C.F.R. § 404.1520(a).  At step one, the ALJ found that Plaintiff did not engage in substantial gainful activity during the relevant period. (R. 19).  At step two, the ALJ found that, through the date last insured, Plaintiff had the following severe impairments: impaired glucose tolerance, hypertension, hyperlipidemia, GERD and OCD. (*Id.*).  At step three, the ALJ determined that, through the date last insured, Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.*).  In assessing the severity of Plaintiff's mental impairments, the ALJ found that Plaintiff had a mild restriction in activities of daily living, moderate difficulties with social functioning, and moderate difficulties with regard to concentration, persistence and pace.[5] (R. 20).

The ALJ assessed that Plaintiff had the residual functional capacity ("RFC") to perform medium work as defined in 20 C.F.R. 404.1567(c), provided that the work was limited to simple, routine and repetitive work that had occasional contact with people. (R. 21).  The ALJ afforded "limited weight" to the findings of Dr. Hopperstad and Dr. Leibu because they started treating Plaintiff after the expiration of Plaintiff's insured status. (R. 22).  The ALJ further found that

---

[5] The ALJ's findings regarding concentration, persistence and pace appear to reference the wrong claimant, as the ALJ mentions, without citing to the record, the presence of "memory deficits" and "IQ scores . . . consistent with borderline intellectual functioning." (R. 20).  Plaintiff's IQ scores are not in the record, nor does the record indicate that Plaintiff had borderline cognitive functioning.  Rather, Plaintiff is described as "extremely smart," (R. 193), and his past work has been in a professional capacity in theater, (R. 162).

Plaintiff's medically-determinable impairments could reasonably be expected to cause the alleged symptoms, but that Plaintiff's statements concerning the intensity, persistence and limiting effects of these symptoms were "not entirely credible for the reasons explained in this decision." (R. 22).

At step four, the ALJ found that, through the date last insured, Plaintiff was unable to perform any past relevant work. (R. 23). At step five, the ALJ considered whether there was other work in the national economy that Plaintiff could have done. (*Id.*). The ALJ used Rule 203.29 of the medical-vocational guidelines, 20 C.F.R. Part 404, Subpart P, Appendix 2, as a framework for his determination. (*Id.*). The ALJ concluded that Plaintiff's non-exertional limitations would have had little or no effect on the occupational base of unskilled medium work and that, therefore, Plaintiff was not disabled during the period at issue. (R. 23–24).

## II. LEGAL FRAMEWORK

### A. Disability Eligibility

A claimant is disabled if she "is unable 'to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.'" *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (quoting 42 U.S.C. § 423(d)(1)(A)). The Social Security Administration ("SSA") has enacted a five-step sequential analysis to determine if a claimant is eligible for benefits based on a disability:

> (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment or combination of impairments; (3) whether the impairment meets or equals the severity of the specified impairments in the Listing of Impairments; (4) based on a "residual functional capacity" assessment, whether the claimant can perform any of his or her past relevant work despite the impairment; and (5) whether there are significant numbers of jobs in the national economy that the

> claimant can perform given the claimant's residual functional capacity, age, education, and work experience.

*McIntyre v. Colvin*, 758 F.3d 146, 150 (2d Cir. 2014) (citing *Burgess v. Astrue*, 537 F.3d 117, 120 (2d Cir. 2008); 20 C.F.R. § 404.1520(a)(4)(i)-(v)).

The claimant has the general burden of proving that he or she is statutorily disabled "and bears the burden of proving his or her case at steps one through four." *Cichocki*, 729 F.3d at 176 (quoting *Burgess*, 537 F.3d at 128). At step five, the burden then shifts "to the Commissioner to show there is other work that [the claimant] can perform." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 445 (2d Cir. 2012).

## B. Standard of Review

When reviewing an appeal from a denial of disability insurance benefits, the Court's review is "limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." *Selian v. Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012)); *see also* 42 U.S.C. § 405(g). The Court does not substitute its judgment for the agency's, "or determine *de novo* whether [the claimant] is disabled." *Cage v. Comm'r of Soc. Sec.,* 692 F.3d 118, 122 (2d Cir. 2012) (alteration in original) (quoting *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998)). However, where the proper legal standards have not been applied and "might have affected the disposition of the case, [the] court cannot fulfill its statutory and constitutional duty to review the decision of the administrative agency by simply deferring to the factual findings of the ALJ." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (quoting *Townley v. Heckler*, 748 F.2d 109, 112 (2d Cir. 1984)). Therefore, "[f]ailure to apply the correct legal standards is grounds for reversal." *Id.* "Where there are gaps in the administrative record or the ALJ has applied an improper legal standard," remand to the Commissioner "for further development of the

evidence" is appropriate. *Rosa v. Callahan,* 168 F.3d 72, 82–83 (2d Cir. 1999) (quoting *Pratts v. Chater*, 94 F.3d 34, 39 (2d Cir. 1996)).

## III. DISCUSSION

Plaintiff challenges the ALJ's decision on several grounds, arguing that (1) the ALJ failed to properly evaluate the treating physician evidence, (2) the ALJ relied on cherry-picked evidence and failed to consider all relevant evidence, (3) the ALJ failed to follow the Commissioner's rules when determining the onset date, (4) the ALJ's analysis at step five was flawed, and (5) the ALJ's credibility determination was inadequate. (Docket No. 23). Conversely, the Commissioner argues that the ALJ's decision should be affirmed because it is supported by substantial evidence and based upon correct legal standards. (Docket No. 25). For the following reasons, the Court finds that the ALJ's decision contains legal errors, which warrant remand.

### A. The ALJ's Evaluation of the Treating Physician Evidence

The record establishes that Plaintiff was diagnosed with and treated for OCD both before and after December 31, 2011, the date he was last insured. Moreover, Dr. Hopperstad's letter and mental impairment questionnaire from May 2014, which are essentially uncontradicted, indicate that Plaintiff's OCD significantly impaired Plaintiff's social and occupational function. (R. 289–95). The primary issue, therefore, is whether, on December 31, 2011, Plaintiff's impairments were so severe that he could not engage in substantial gainful activity. In other words, the issue is whether Plaintiff's impairments became disabling before his insured status expired.

Plaintiff argues that the ALJ improperly evaluated the retrospective diagnosis of Dr. Hopperstad, who began treating Plaintiff about eleven months after Plaintiff's date last insured.

(Docket No. 23 at 12–15). The ALJ was not required to give controlling weight to Dr. Hopperstad's opinions pursuant to the treating physician rule because Dr. Hopperstad was not Plaintiff's treating physician during the relevant time period. *See Rogers v. Astrue*, 895 F. Supp. 2d 541, 550 (S.D.N.Y. 2012) (citing *Monette v. Astrue*, 269 F. App'x 109, 112–13 (2d Cir. 2008)). Nonetheless, "[a] treating physician's retrospective medical assessment of a patient may be probative when based upon clinically acceptable diagnostic techniques." *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996) (citing *Wagner v. Sec'y of Health & Human Servs.*, 906 F.2d 856, 861 (2d Cir. 1990)); *see also Shaw v. Chater*, 221 F.3d 126, 133 (2d Cir. 2000) (holding that ALJ improperly discounted treating physician's retrospective diagnosis); *Dousewicz v. Harris*, 646 F.2d 771, 774 (2d Cir. 1981) (concluding that a subsequent treating physician's opinion was "still entitled to significant weight," even though he "did not treat the [claimant] during the relevant period"). Moreover, the Second Circuit has held that, "while a treating physician's retrospective diagnosis is not conclusive, it is entitled to controlling weight unless it is contradicted by other medical evidence or 'overwhelmingly compelling' non-medical evidence." *Byam v. Barnhart*, 336 F.3d 172, 183 (2d Cir. 2003) (citing *Rivera v. Sullivan*, 923 F.2d 964, 968 (2d Cir. 1991); *Wagner*, 906 F.2d at 862); *cf. Monette*, 269 F. App'x at 113 ("We identify no error in the ALJ's refusal to accord [the treating physician's] retrospective opinion significant weight *because there is substantial evidence that the opinion is contradicted by other evidence*." (emphasis added)).

Here, Dr. Hopperstad provided a Mental Impairment Questionnaire assessing Plaintiff's impairments, (R. 290–95), as well as a letter explaining that Plaintiff's "impairment significantly impacts his social and occupational function such that he has been unable to work regularly *for*

*the last several years.*[6] (R. 289 (emphasis added)).  Thus, Dr. Hopperstad's assessment included

a retrospective component.  The ALJ afforded "limited weight" to the findings of Dr.

Hopperstad, reasoning that Dr. Hopperstad began treating Plaintiff "well after" (*i.e.*, eleven

months after) Plaintiff's last insured date. (R. 22).  However, the ALJ failed to articulate any

good reason to conclude that Dr. Hopperstad's retrospective assessment was contradicted by

other evidence in the record or not based on clinically acceptable diagnostic techniques.  Rather,

as discussed further below, Dr. Hopperstad's opinions regarding the severity and onset of

Plaintiff's functional limitations appear to be consistent with and supported by other evidence in

the record.  The ALJ's failure to articulate good reasons for discounting Dr. Hopperstad's

medical opinion constitutes legal error, which requires remand. *See Snell v. Apfel*, 177 F.3d 128,

133 (2d Cir. 1999).

**B.  The ALJ's Selective Reliance on Portions of Dr. Dillon's Medical Records**

Plaintiff argues that "the ALJ selectively cherry-picked evidence that supported his

ultimate determination without regard to positive clinical findings contained within the same

medical records." (Docket No. 23 at 15–17).  Specifically, the ALJ's decision highlights that the

"records of Dr. Stephen Dillon reveal the claimant on more than one occasion denied depression,

depressed mood, anhedonia, memory loss, and insomnia." (R. 21).  The ALJ's reliance on this

language is problematic for two reasons.

First, the language referenced by the ALJ recurs in the "Review of Systems" portions of

Dr. Dillon's records.  Plaintiff asserts that the "Review of Systems" language is computer-

generated, (Docket No. 23 at 16); whereas, the Commissioner argues that Plaintiff's assertion is

---

[6] The Commissioner correctly asserts that the ALJ was not required to defer to Dr. Hopperstad's opinion that
Plaintiff was "unable to work," which is a finding reserved to the Commissioner. (Docket No. 25 at 17–18).
However, Dr. Hopperstad's letter and questionnaire also reflect Dr. Hopperstad's medical assessment of the severity
and onset of Plaintiff's impairments. (R. 289–95, 98).

"speculative" and "meritless," (Docket No. 25 at 18). Based on the record alone, it is impossible to determine with certainty whether such language was computer-generated or deliberately included by Dr. Dillon. At the very least, however, there are facts that call into question the reliability of the language at issue. Identical text—including irregularities and errors in font size, punctuation and spacing—appears in every "Review of Systems" chart included in the medical records from Dr. Dillon. (R. 242, 249, 253, 257). By contrast, the diagnosis of OCD appears within all of Dr. Dillon's medical records, but in a different location and manner in each instance. (R. 241–43; 244–45; 246–47; 248–51; 252–55; 256–58; 259–60). Moreover, the language at issue appears despite inconsistent references to "marked depression" and "sleep apnea" in other portions of Dr. Dillon's records. (R. 252–53). The ALJ's decision also does not attempt to reconcile the language at issue with the other medical evidence in the record, including Dr. Weiss's notes indicating that Plaintiff had been in crisis in January 2012, when Plaintiff spent most of his time in bed. (R. 225; *see also* R. 224 ("OCD sex + Paramount Pictures"); R. 220 ("depression not improved"); R. 219 ("[increased] depression"); R. 218 (notations of chronic depression, OCD and emotional eating)). The ALJ should have addressed these inconsistencies before relying on the language at issue.

Second, the ALJ failed to explain how the language at issue contradicts the severity of Plaintiff's OCD-related impairments. Even if Plaintiff had, on multiple occasions, denied depression, depressed mood, anhedonia, memory loss and insomnia, it is unclear why such denials would negate the repeated assessments of Plaintiff's physicians, including Dr. Dillon, that Plaintiff had OCD, as well as the assessment of Dr. Hopperstad that Plaintiff's OCD severely limited Plaintiff's ability to function. Accordingly, the portions of Dr. Dillon's records

selectively cited by the ALJ do not constitute substantial evidence in support of the ALJ's decision.

## C. Applicability of Social Security Ruling 83-20

Here, the determination of disability is inextricably tied to the question of onset date, as the central issue is *when* Plaintiff's impairments became disabling. Social Security Ruling ("SSR") 83-20 provides rules for determining the onset date of a disability. *Rogers*, 895 F. Supp. 2d at 552; *see generally* SSR 83-20, 1983 WL 31249, at *1 (S.S.A. 1983). More specifically, SSR 83-20 provides that, for disabilities of nontraumatic origin, "the determination of onset involves consideration of the applicant's allegations, work history, if any, and the medical and other evidence concerning impairment severity." *Id.* at *2. SSR 83-20 further explains:

> With slowly progressive impairments, it is sometimes impossible to obtain medical evidence establishing the precise date an impairment became disabling. Determining the proper onset date is particularly difficult, when, for example, the alleged onset and the date last worked are far in the past and adequate medical records are not available. In such cases, it will be necessary to infer the onset date from the medical and other evidence that describe the history and symptomatology of the disease process.

*Id.* The Supreme Court has affirmed that Social Security Rulings are binding upon the Commissioner. *Heckler v. Edwards*, 465 U.S. 870, 873 n.3 (1984). In particular, an ALJ's failure to determine the onset date in accordance with SSR 83-20 can constitute legal error warranting remand. *See Rogers*, 895 F. Supp. 2d at 552–54.

The Commissioner argues that SSR 83-20 does not apply here because the "ruling addresses establishing the onset date of disability where an individual is determined to be disabled" and Plaintiff "was determined not to be disabled, so the question of the onset date of disability did not arise." (Docket No. 25 at 18–20). The Commissioner does not cite any case law in support of her position. The Court disagrees with the Commissioner's interpretation of

SSR 83-20.  The introduction of SSR 83-20 explains that the determination of the onset date is

critical because "it may affect the period for which the individual can be paid and *may even be*

*determinative of whether the individual is entitled to or eligible for any benefits*." SSR 83-20,

1983 WL 31249, at *1 (emphasis added).  "This language plainly indicates the ruling is intended

to apply to cases such as the one at bar." *Grebenick v. Chater*, 121 F.3d 1193, 1200 (8th Cir.

1997).[7]

There is no indication the ALJ attempted to infer Plaintiff's onset date in accordance with

SSR 83-20.  Rather, the ALJ relied on the absence of contemporaneous medical records to find

that Plaintiff was not disabled before his insured status expired. (R. 22).  However, "the absence

of contemporaneous medical records does not preclude a finding of disability." *Rogers*, 895 F.

Supp. 2d at 552 (quoting *Plumley v. Astrue*, No. 2:09-CV-42, 2010 WL 520271, at *7 (D. Vt.

Feb. 9, 2010)).  Instead, "onset of disability may be inferred in accordance with the criteria set

forth in SSR 83-20." *Rogers*, 895 F. Supp. 2d at 553 (quoting *Manago v. Barnhart*, 321 F. Supp.

2d 559, 569 (E.D.N.Y. 2004)).

In particular, the ALJ's decision contains no reasoned analysis of the "medical and other

evidence that describe the history and symptomatology of the disease process," SSR 83-20, 1983

WL 31249, at *2, including Plaintiff's testimony that his hoarding had worsened in "mid 2011,"

(R. 40), and Plaintiff's statement to Dr. Weiss that he had been in crisis in January 2012,

---

[7] In *Baladi v. Barnhart*, the Second Circuit found that SSR 83-20 was inapplicable "because the ALJ's determination that plaintiff was not disabled obviated the duty under SSR 83-20 to determine an onset date." 33 F. App'x 562, 564 (2d Cir. 2002) (non-binding summary order).  *Baladi* is distinguishable.  In that case, the ALJ expressly found that the claimant was not disabled as of the date of the decision. *See id.* at 563 (noting that the ALJ found the claimant "was not disabled for purposes of SSI or SSD benefits").  Here, by contrast, the ALJ did not address whether Plaintiff was disabled as of the decision date, but rather relied on the record's ambiguity about the onset date to find that Plaintiff was not disabled as of Plaintiff's date last insured. *See Blanda v. Astrue*, No. 05-CV-5723 (DRH), 2008 WL 2371419, at *14 (E.D.N.Y. June 9, 2008) (distinguishing *Baladi* on similar grounds); *Wilson v. Colvin*, 17 F. Supp. 3d 128, 143 n.31 (D.N.H. 2014) (same).

(R. 225). Additionally, the ALJ's decision entirely ignores the detailed observations from Plaintiff's sister of how OCD impacted Plaintiff's life over "many years." (R. 193–95).

Moreover, the ALJ did not seek the services of a medical advisor to assist with a determination of onset date. Pursuant to SSR 83-20, "when the evidence in the record is ambiguous, the ALJ must seek the advice of a medical advisor in trying to infer an onset date." *Rogers*, 895 F. Supp. 2d at 553 (citing SSR 83-20, 1983 WL 31249, at *3). On remand, the Commissioner's decision should comply with the requirements of SSR 83-20.

### D. Duty to Develop the Record

Plaintiff argues that, to the extent the ALJ found the evidence from the relevant time period to be lacking, the ALJ erred in failing to develop a full and fair record. (Docket No. 23 at 19). Although a claimant bears the burden of proving disability and Plaintiff was represented by counsel, the ALJ had an affirmative duty to develop the record. *See Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982); *Perez*, 77 F.3d at 47.

Plaintiff reported to the Commissioner that he received mental health treatment from Dr. Daniel Cohen between 2007 and April 2011, eight months before the alleged onset date. (*See* R. 173–83; 244). There is no indication in the record that the Commissioner attempted to contact or obtain records from Dr. Cohen. Given that Dr. Cohen treated Plaintiff for OCD during a portion of the twelve-month period prior to Plaintiff's date last insured, (R. 178), and that a central issue in this case is when Plaintiff's OCD-related impairments became disabling, the Commissioner's failure to solicit records from Dr. Cohen constituted legal error. *See* 20 C.F.R. § 404.1512(b) ("If applicable, we will develop your complete medical history for the 12-month period prior to the month you were last insured for disability insurance benefits."); SSR 83-20, 1983 WL 31249, at

*3 ("If there is information in the file indicating that additional medical evidence concerning onset is available, such evidence should be secured before inferences are made.").

Additionally, the ALJ's questions at the hearing regarding the period at issue were surprisingly scant. (R. 32–48). Absent from the ALJ's examination were questions regarding Plaintiff's level of functioning on or before December 31, 2011, the date Plaintiff was last insured for benefits. At one point, Plaintiff described his hoarding condition as having worsened in "mid 2011," before his date last insured, but the ALJ did not ask follow-up questions or otherwise inquire about Plaintiff's condition during 2011. (R. 40). On remand, further testimony from Plaintiff regarding the period at issue may be necessary to fully and fairly develop the record.

## E. The ALJ's Credibility Determination

Plaintiff also argues that the ALJ improperly evaluated Plaintiff's credibility. (Docket No. 23 at 23–25). Social Security Ruling 96-7p provides that, in determining the credibility of a claimant's statements, an ALJ "must consider the entire case record." SSR 96-7p, 1996 WL 374186, at *1 (S.S.A. July 2, 1996).[8] Moreover, "[a]n individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." *Id.* The ALJ's determination of the claimant's credibility "must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the

---

[8] SSR 96-7p was superseded by SSR 16-3p as of March 28, 2016, but it was in effect at the time of the ALJ's decision. *See* SSR 16-3p, 2017 WL 5180304, at *1 (S.S.A. Oct. 25, 2017). SSR 16-3p explains that the SSA expects "the court to review the final decision using the rules that were in effect at the time [the SSA] issued the decision under review." *Id.*

weight the adjudicator gave to the individual's statements and the reasons for that weight." *Id.* at *2.

Here, the ALJ found that Plaintiff's statements concerning the intensity, persistence and limiting effects of Plaintiff's symptoms were "not entirely credible for the reasons explained in this decision." (R. 22). Having reviewed the ALJ's decision, the Court is unable to find adequate reasons for the ALJ's decision to discredit Plaintiff's statements regarding the intensity, persistence and limiting effects of his symptoms.

The Commissioner suggests there is an inconsistency between the fact that "plaintiff reported that he had OCD since age twelve" and the fact that "he was able to work as an adult." (Docket No. 25 at 21 (citing R. 241)). Plaintiff spoke directly to this point when applying, stating in his function report, "I first exhibited symptoms of an obsessive compulsive disorder in 1976 when I was 12. [I] [t]ried to manage and hide my disorder. In 2004, [it] became too traumatic and difficult to control [this] disorder." (R. 133). Contrary to the Commissioner's suggestion, "[a] claimant with a good work record is entitled to substantial credibility when claiming an inability to work because of a disability." *Rivera v. Schweiker*, 717 F.2d 719, 725 (2d Cir. 1983).

The Commissioner also argues that Plaintiff's "full range of activities of daily living" discredits his claims about the severity of his OCD and other symptoms. (Docket No. 25 at 21). According to the Commissioner's description, Plaintiff "was able to take care of himself independently, doing his own laundry and grocery shopping . . . . He had social contacts and went out to dinner with them at restaurants regularly . . . . He also used a computer to read the internet and keep in touch with his family." (Docket No. 25 at 21).

However, the Commissioner selectively omits facts from her summary of the testimony and other evidence. Plaintiff testified that he does laundry with "extreme difficulty," as it "presents a great deal of potential contamination forming." (R. 43). He testified that he finds keeping up with acquaintances "very difficult" and that he does not enjoy "going out socially." (*Id.*). He purchases cooked food, using support from his parents and credit card debt, because his stove has not worked in years. (R. 42). He cleans his apartment during decontamination cycles for two to three hours at a time, yet his apartment is barely habitable because of his hoarding. (R. 41–42; *see also* R. 193–95).

Moreover, in his function report, Plaintiff explained that he only leaves his apartment two to three times a week when it is necessary for him to pick up medication, go to a doctor's appointment or get food. (R. 127–28). He does not shower or change clothes on days when he does not leave his apartment. (R. 127). He finds it "[d]ifficult to get around [in his] apartment," not only due to hoarding, but because it is "filled with items which set off [his] OCD." (R. 126). When he prepares to leave his apartment, he has difficulty showering and getting dressed because he has to touch contaminated items, such as his shoes, parts of the shower, and his hair dryer. (*Id.*). As Plaintiff's OCD focuses on anything related to Paramount Pictures, (R. 213), his ability to watch television and read the internet to "stay up to date with news in the entertainment industry," (R. 45), hardly undercuts the extremity of his OCD.

The Commissioner emphasizes that Plaintiff "did not seek treatment for any medical condition for the thirteen months surrounding the date he allegedly became disabled." (Docket No. 25 at 15). While a person may be expected to seek medical treatment for a physical injury immediately to address pain and treatment needs, the very nature of a psychiatric condition may cause the individual to be isolative and is therefore different. *See Cataneo v. Astrue*, No. 11-cv-

2671 (KAM), 2013 WL 1122626, at *20 (E.D.N.Y. Mar. 17, 2013) (finding that no inference

should be drawn from a claimant's failure to seek psychiatric treatment, as such impairments

might cause a person to be isolative).  Here, Plaintiff was getting progressively worse and

decompensating toward the end of 2011 and had an emotional crisis in January 2012, when he

stayed in bed most of the time. (R. 40, 225).  Given the nature of Plaintiff's mental illness and

his crisis in January 2012, it is not unexpected that he would not seek immediate medical

treatment.  Moreover, Plaintiff explained this to his treating physician the next time he went for

treatment, long before his application for Social Security benefits. (R. 225).  On remand, the ALJ

should evaluate Plaintiff's credibility in accordance with the record as a whole and provide

specific reasons for the weight assigned to Plaintiff's statements.[9]

## IV.  CONCLUSION

For the foregoing reasons, Plaintiff's motion for judgment on the pleadings is granted and

the Commissioner's cross-motion for judgment on the pleadings is denied.  The case is

remanded, pursuant to sentence four of 42 U.S.C. § 405(g), to the Commissioner for further

administrative proceedings consistent with this decision.  The Clerk is respectfully requested to

terminate the pending motions (Docket Nos. 20, 24) and close the case.


Dated:    March 20, 2018
          White Plains, New York

                                        SO ORDERED:


                                        _____
                                        JUDITH C. McCARTHY
                                        United States Magistrate Judge

---

[9] Plaintiff also argues that the Commissioner did not meet her burden at step five of the sequential analysis. (Docket No. 23 at 21–23).  In light of the findings above, which warrant remand, the Court need not reach this issue.  The Court notes, however, that the ALJ received no testimony from a vocational expert at the hearing, which may be necessary on remand.